IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARQUINCY TEAGUE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) 11-cv-0042 |
| v. | ) |
| | ) Hon. John Z. Lee |
| TRAVIS ARMSTEAD, CHICAGO POLICE DEPARTMENT, and CITY OF CHICAGO, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

This dispute arises out of an alleged confrontation between Plaintiff Marquincy Teague and Defendant Chicago Police Officer Travis Armstead in the lock-up area of a Chicago police station. According to Teague, he was standing in the lock-up area when Officer Armstead struck him from behind without provocation, causing Teague to hit his head on the floor and black out. After Teague woke up, he was handcuffed and transported to the hospital by two other officers, where he received medical care, including stiches. Officer Armstead, however, recalled a very different set of events. According to him, Teague assaulted him while Armstead was trying to search Teague in the lock-up area and hit his head as Armstead was trying to subdue him. In the end, Teague was convicted in Illinois state court for assaulting a police officer as a result of the incident.

Undeterred, Teague filed suit against Armstead, the Chicago Police Department ("CPD"), and the City of Chicago in this Court, seeking damages under 42 U.S.C. § 1983 for excessive use of force. Teague also contends that CPD and the City failed in their duty to preserve video recordings that were material to this legal action, thereby committing negligent spoliation of evidence under Illinois law.

1

Defendants move for summary judgment, arguing that Teague's excessive force claim is barred under *Heck v. Humphrey*, 512 U.S. 477 (1994), because success on that claim would necessarily invalidate Teague's state court conviction. Defendants also maintain that Officer Armstead is entitled to qualified immunity because the undisputed facts show no constitutional violation occurred. Defendants lastly urge the Court to decline to exercise supplemental jurisdiction over Teague's state law claim.

For his part, Teague argues that *Heck* does not bar his claims and outlines three factual scenarios in support of his excessive force claim, which he contends would not necessarily invalidate his state court conviction. Teague also argues that qualified immunity is unavailable to Officer Armstead, that the negligent spoliation claim should be allowed to proceed, and that the destruction of evidence creates an adverse inference against Defendants requiring this case to go to trial. For the reasons provided herein, the Court grants Defendants' motion for summary judgment.

## I. Factual Background[1]

### A. Incident in the Seventh District Station Lock-Up Area

On August 20, 2009, the CPD took Teague into custody following a report of a domestic disturbance at Teague's home. Defs.' Am. LR 56.1(a)(3) Stmt. ¶ 6. CPD Officers brought Teague to the Seventh District Station for processing and, during processing, Teague was moved to an area of the station known as the "lock-up." *Id.* ¶¶ 7–8. While Teague was being processed, Officer Armstead was in charge of the lock-up area. *Id.* ¶ 9.

The facts of this case center on a confrontation between Officer Armstead and Teague in the lock-up area. The parties agree that, sometime while Teague was in the lock-up area, Teague and Officer Armstead had a confrontation, Teague was knocked unconscious, awoke with a cut

---
[1] The following facts are undisputed, unless otherwise noted.

2

on his head, and was taken to the hospital. *Id.* ¶ 11; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 10. As to the rest, however, the parties' positions diverge.

In their motion, Defendants argue that Teague has no personal, first-hand knowledge of what caused him to lose consciousness. Defs.' Am. LR 56.1(a)(3) Stmt. ¶ 11. Teague responds that he does possess first-hand knowledge of being struck from behind, but admits he lacks knowledge of who hit him and with what. *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 11. Defendants further assert Teague only identified Officer Armstead as the assailant based on Officer Armstead's testimony during Teague's criminal trial. Defs.' Am. LR 56.1(a)(3) Stmt. ¶ 12. On the other hand, Teague maintains that he identified Officer Armstead as his assailant based on comments he overheard in the lock-up area after his return from the hospital. In particular, Teague overheard other individuals commenting that Officer Armstead "kicked [Teague's] ass." *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 11. Teague also contends that, when he returned to the police station from the hospital, he overheard individuals arguing with Officer Armstead about hitting Teague, and at least one person telling Officer Armstead that he should have killed Teague because now Officer Armstead was "going to have a problem." *See* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 26–27.[2] Both sides admit there were no other witnesses present during the confrontation between Officer Armstead and Teague. *See* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 5; Defs.' Reply Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 5.

B.  **The Criminal Trial**

After the confrontation, Teague was charged with aggravated battery to a police officer. Defs.' Am. LR 56.1(a)(3) Stmt. ¶ 13. A criminal bench trial was held on September 28, 2010, and Teague was found guilty of two counts of aggravated battery against a police officer. *Id.*

---

[2] Defendants object to the statements Teague overheard in the Seventh District Station as inadmissible hearsay. *See* Defs.' Reply Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 25–27.

3

At the bench trial, Officer Armstead testified that, around 5:25 a.m., he attempted to search Teague while Teague was in the lock-up holding cell. *Id.* ¶ 14. Teague was not wearing handcuffs at the time. *Id.* Officer Armstead noticed that Teague appeared to be under the influence of alcohol with reddish eyes. *Id.* Teague told Officer Armstead he "wasn't gonna be able to search him." *Id.* Teague then grabbed Officer Armstead's wrist, sat down on a bench, braced himself, and kicked Officer Armstead, inflicting a "glancing blow." *Id.* To defend himself, Officer Armstead asserted, he struck Teague with an open-hand blow, using a technique that was approved by the police department and for which he had received official training. *Id.* ¶ 15. Officer Armstead then initiated a take-down of Teague, during which time Teague struck his head. *Id.* During the criminal trial, the parties stipulated that Teague was treated at the hospital that day for blunt head trauma and received six stiches to fix a single laceration to his forehead. *Id.* ¶ 16.

The court found that Officer Armstead's testimony was non-evasive; the evidence supported a finding that Officer Armstead was engaged in his official duties; Armstead had subdued Teague using physical force as approved by the police department; and Teague's actions caused physical contact of an insulting nature and bodily harm to Officer Armstead. *Id.* ¶ 17. Teague appealed the guilty finding to the Appellate Court of Illinois, First District. *Id.* ¶ 18. The Appellate Court upheld the trial court's ruling. *Id.*

C.  **Plaintiff's Version**

Teague does not dispute that Officer Armstead testified in this manner at the trial. *See generally* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 14–18. Instead, Teague contends that an altogether different confrontation occurred outside of the lock-up area holding cell. *See generally id.* According to Teague, he was hit from behind without provocation while he was being processed.

*See* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 1. This blow came after CPD personnel directed Teague to walk from the photographing area of the lock-up to the group holding cell. *See id.* After being struck, Teague fell and hit his head on the cell floor. *See id.* Teague attests that he was not under the influence of drugs or alcohol at the time. *See id.* ¶ 2. Teague next remembers waking up with blood on his face and his feet lying in the group holding cell doorway. *See id.* ¶ 3.

Defendants generally object to Teague's version of events. *See generally* Defs.' Reply Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 1–5. Defendants also offer two additional facts in contravention. First, Defendants point out that Teague testified that, after he woke up on the floor, there was a police officer standing over him who said "get up, I'm taking you to the hospital." *See id.* ¶ 1, 3. Second, Defendants note that Teague testified he then got up, turned around, was handcuffed, and was taken to the hospital. *See id.* ¶¶ 1, 3. Furthermore, at the hospital, Teague informed medical professionals that he was hit from behind and that he was ultimately unsure whether he lost consciousness (after initially denying he had). *See* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 9. Both sides agree that Teague suffered a single, three centimeter long laceration to his head due to blunt head trauma. *See id.* ¶ 10; Defs.' Reply Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 10.

### D. The Investigation of the Incident

Sean Ryan, a CPD detective, arrived at the police station sometime between 7:05 a.m. and 7:10 a.m. to investigate Officer Armstead's claim that Teague had assaulted him. *See* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 8; Defs.' Reply Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 8. Teague contends that Detective Ryan never attempted to make an independent determination of whether a video existed recording the incident outside the holding cell. *See* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 12. Defendants deny this fact and cite Ryan's deposition statements that he inquired about a video of

the incident with Officer Armstead and the sergeant on duty, who suggested no video existed. *See* Defs.' Reply Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 12.

Defendants do not dispute that Detective Ryan never asked a CPD evidence technician to take pictures of Teague's blood stain, which was on the floor of the lock-up holding cell, or mentioned the blood stain's existence or location in his investigation documents. *See* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 13. Furthermore, Detective Ryan interviewed Teague at the hospital but could not recall key details of this interview, including whether Teague had been handcuffed to the bed, had received stitches for his eye, or had been medicated. *See id.* ¶ 14. Additionally, Detective Ryan did not recall whether he had ever spoken to the medical professionals who were treating Teague, had sought medical records relating to Teague, or had determined if Teague had lost consciousness or was under the influence of intoxicants at the time. *See id.*[3]

After his investigation, Detective Ryan submitted his findings to an Assistant State's Attorney working in Felony Review to determine whether Teague would be charged with a felony. Teague asserts that Detective Ryan did not conduct a diligent and thorough investigation as required by CPD's Standard Operating Procedures before he called Felony Review. *See* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 16. In particular, Teague believes Detective Ryan based his report to Felony Review solely on Officer Armstead's version of events. *See id.* In addition, Teague contends that, if Detective Ryan had been following CPD protocol, he and the Assistant State's Attorney would have discussed the existence of an incident video, and that Ryan would have

---

[3] Along these lines, Teague denies that Detective Ryan, or any other CPD personnel, ever tried to interview him, stating that he first met Detective Ryan at his deposition. *See id.* ¶ 15. Defendants, however, contend that Detective Ryan went to see Teague in the hospital and was told by Teague that he did not want to speak with him. *See* Defs.'Reply Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 15; *see also* Defs.' Am. LR 56.1(a)(3) Stmt., Ex. F, Ryan Dep., Feb. 5, 2014, 60:2–14.

stated that no such video existed, again, based only upon his conversation with Officer Armstead. *See* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 18–19.

Defendants dispute these facts, arguing that Detective Ryan also had spoken to the desk sergeant at the police station. *See* Defs.' Reply Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 17; *see also* Defs.' Am. LR 56.1(a)(3) Stmt., Ex. F, Ryan Dep., 13:1–13; 30–34. Defendants also note that, at his deposition, Detective Ryan stated that he could not recall if he discussed the existence of a video tape that morning or not. *See* Defs.' Reply. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 18–19; *see also* Defs.' Am. LR 56.1(a)(3) Stmt., Ex. F, Ryan Dep., 79:19–24; 80:1–14. In any case, that morning, at 8:55 a.m., the Assistant State's Attorney approved filing felony aggravated battery charges against Teague. *See* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 21.

Teague returned to the police station a little later that morning and requested to speak to a police sergeant, captain, or lieutenant about Officer Armstead allegedly assaulting him. *See id.* ¶ 22. Teague was ignored. *See id.* Teague claims that he could still see his blood on the floor, and Detective Ryan did not try to interview Teague when he returned to the station. *See id.* ¶¶ 23–24.

### E. Video Recording Equipment in the Seventh District Station

The parties appear to agree that the Seventh District Station had two surveillance cameras located in the lock-up area. *See* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 6–7; Defs.' Reply Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 6–7. The video recordings made by the cameras were programmed to be recycled or "taped over" every thirty days. *See* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 29. At the time of the incident, CPD did not have a written video preservation policy for incidents involving physical altercations between an officer and an individual in custody. *See id.* ¶ 30. Notwithstanding the lack of an official video preservation policy, the commander had the ability

to copy video off of the DVR video recording reel. *See id.* ¶ 31. However, the video from August 20, 2009, was not copied but was recycled automatically on September 21, 2009. *See id.* ¶ 34.

Teague argues that the cameras should have recorded the incident of him being struck from behind, and that nothing suggests the cameras were not working at the time of the alleged incident. *See* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 6–7. Defendants point out that, during the criminal proceedings, Teague's Assistant Public Defender represented that, although she and Teague had thought that a video recording may have existed, upon closer examination, they determined that a video of the incident did not exist. *See id.* The state court trial judge accepted this representation. *See id.*; *see also* Defs.' Reply Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 6–7.

## II. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court gives "the non-moving party the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP,* 719 F.3d 785, 794 (7th Cir. 2013). In order to survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts[,]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986), and instead "must establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.,* 674 F.3d 769, 772–73 (7th Cir.2012). The Court will, however, "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statements." *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000).

## III. Analysis

### A. Excessive Force Claim

#### 1. *Heck v. Humphrey*

Defendants first invoke *Heck v. Humphrey*, 512 U.S. 477 (1994). Under *Heck*, "unless a plaintiff can demonstrate his conviction or sentence has already been invalidated," a district court should dismiss a plaintiff's § 1983 suit if "a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence." *Id.* at 487. However, "a fourth-amendment claim can coexist with a valid conviction." *Evans v. Poskon*, 603 F.3d 362, 364 (7th Cir. 2010). "Therefore, in considering whether *Heck* requires dismissal, we must consider the factual basis of the claim and determine whether it necessarily implies the invalidity of [Plaintiff's] conviction." *Helman v. Duhaime*, 742 F.3d 760, 762 (7th Cir. 2014). Defendants argue that Teague's excessive force claim, if successful, would necessarily invalidate his criminal conviction for assaulting Officer Armstead because it would foreclose the possibility that this assault ever took place.

As an initial matter, Teague was convicted under an Illinois statute for "knowingly and without legal justification caus[ing] bodily harm" or "mak[ing] physical contact of an insulting or provoking nature" with a victim that the assailant knows to be a police officer working in their official capacity. *See* 720 Ill. Comp. Stat. 5/12-4(b)(18); *id.* 5/12-3(a); *see also* Defs.' Am. LR 56.1(a)(1)(3) Stmt. ¶ 17. During the criminal bench trial, Officer Armstead testified that, while inside the lock-up, he attempted to search Teague. *See* Defs.' Am. LR 56.1(a)(3) Stmt., Ex. E, *People v. Teague*, Case No. 1-10-3921 (Ill. App. Ct.). Teague resisted, telling him that he "wasn't gonna be able to search him." *See id.* Teague then grabbed Officer Armstead by the left wrist and pulled Armstead toward him. *See id.* Teague then kicked him. *See id.* After this,

9

Officer Armstead testified to taking Teague to the ground with an open hand technique approved by the police department, during which time Teague hit his head. *See id.* The State's sole witness at the trial was Officer Armstead. *See id.* The Illinois Appellate Court upheld Teague's conviction based on Officer Armstead's testimony, which Teague had challenged on appeal as improperly admitted. *See id.*

Teague does not claim that his conviction has been invalidated. Instead, Teague argues that *Heck* does not apply because the facts supporting his excessive force claim, if proven, still leave room for the essential facts supporting his criminal conviction. Teague, however, is incorrect.

Teague's longstanding factual allegations are of an unprovoked confrontation outside the holding cell. Teague alleges he was being led to the lock-up holding cell after being processed and photographed when Officer Armstead, unprovoked, struck Teague on the back of the head. Teague further asserts that, after Officer Armstead struck him, he fell to the floor, hit his head, was knocked unconscious, and then woke up with a different police officer standing over him. This other officer handcuffed Teague and explained to him that he was going to the hospital. Teague was then taken to the hospital to be treated for a single laceration to his head.

Under this sequence of facts, *Heck* bars Teague's excessive force claim. "[A] plaintiff's claim is *Heck*-barred despite its theoretical compatibility with his underlying conviction if specific factual allegations in the complaint are necessarily inconsistent with the validity of the conviction." *McCann v. Neilsen*, 466 F.3d 619, 621 (7th Cir. 2006); *Hoeft v. Anderson*, 409 F. App'x 15, 18 (7th Cir. 2011) (affirming application of *McCann* and granting of motion for summary judgment under *Heck*). Teague's theory, and the evidence Teague has offered supporting it, presents a "clear sequence of events" that, if affirmed in a civil judgment for

Teague, would necessarily invalidate his criminal conviction for assaulting Officer Armstead. The reason is simple: Teague's version of the events and Officer Armstead's version of the events (which was adopted by the trial court) are mutually exclusive. Teague fell and hit his head when either (1) he was assaulted by Officer Armstead as Teague was being ushered to a holding cell, or (2) he was forced to the ground by Officer Armstead, after Teague first had assaulted the officer in a holding cell. Under Teague's rendition of the facts, an essential element of the aggravated assault charge, namely, that Teague actually made "physical contact of an insulting or provoking nature" to Officer Armstead, could not have occurred.

To evade *Heck*, Teague presses a two-incident theory. He argues that it is possible that Officer Armstead first attacked him *outside* the holding cell and then (presumably, after Teague got back up) pushed Teague to the ground inside the cell after Teague assaulted him. But this theory ignores the undisputed fact that Teague only fell and hit his head *once*. Along these lines, Defendants offer evidence that the incident *inside* the holding cell was the only incident. Defendants point out that Teague claims Officer Armstead first struck him from behind, *outside* the holding cell, while he was being directed by CPD personnel to walk from the photographing area to a group holding cell. *See* Pl.'s 56.1(b)(3)(C) Stmt. ¶ 1. Teague next recalls waking up with blood on his face and with his feet lying in the doorway of the group holding cell. *See id.* ¶ 3. Teague points to no evidence that would suggest that he fell and hit his head outside the cell and subsequently fell and hit his head again inside the cell.

In response, Teague argues that he is not certain when he lost consciousness, citing to the affidavit of Dr. Eric Moon, a treating physician at the hospital.[4] Dr. Moon attests, based upon an

---

[4] Teague cannot offer his own affidavit attesting to these facts because this would contradict his prior deposition testimony. *See Amadio v. Ford Motor Co.*, 238 F.3d 919, 926 (7th Cir. 2001). "It is axiomatic a 'party may not attempt to survive a motion for summary judgment by manufacturing a factual

11

Emergency Department Record, that after Teague was brought to the hospital he initially denied losing consciousness at the time he suffered the head laceration, but then later said he was "not sure" whether he had lost conscious or not. *See* Pl.'s Mem. Opp'n, Ex. I (affidavit of Dr. Eric S. Moon) ¶ 18; *see also id.*, Ex. 1 (Emergency Department Record). From this solitary fact, Teague asks the Court to infer that two separate confrontations took place. To do so, the Court would need to infer that (1) Officer Armstead struck Teague, unprovoked, causing Teague to fall, whereupon Teague hit his head but was *not* rendered unconscious, and then (2) Teague was brought inside the holding cell, where he assaulted Officer Armstead and was taken down by Officer Armstead, was again knocked to the floor, and *only then* taken to the hospital. But there is simply no evidence to reasonably base such an inference. *See McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003) (courts "'are not required to draw every conceivable inference from the record,' and 'mere speculation or conjecture' will not defeat a summary judgment motion'") (quoting *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1139 (7th Cir. 1997)); *Amadio*, 238 F.3d at 927; *see also Chic. United Indus., Ltd. v. City of Chic.,* 685 F. Supp. 2d 791, 818 (N.D. Ill. 2010), *aff'd*, 669 F.3d 847 (7th Cir. 2012) ("It is well-settled that speculation may not be used to manufacture a genuine issue of fact.").

Teague offers four additional arguments, none of which saves Teague's excessive force claim. First, Teague posits that Officer Armstead used excessive force *inside* the cell, based on the same confrontation that resulted in the criminal conviction. See Pl.'s Opp'n 12. It is possible that Teague's excessive force claim would not be *Heck*-barred if it were premised on the *same* confrontation that led to his criminal conviction. *See Hoeft*, 409 F. App'x at 18; *see also Ocasio v. Turner*, 19 F. Supp. 3d 841, 855 (N.D. Ind. 2014) (claims that "the police used excessive force

---

dispute through the submission of an affidavit that contradicts prior deposition testimony.'" *Kent v. City of Chic.*, 814 F. Supp. 2d 808, 817 (N.D. Ill. 2011) (quoting *Amadio*, 238 F.3d at 926).

in effecting custody" generally survive *Heck*). But Teague's First Amended Complaint does not allege any facts involving a confrontation with Officer Armstead inside the cell. *See generally* Pl.'s 1st Am. Compl. ¶¶ 10–15. Teague can, of course, plead and assert alternative legal theories. However, he cannot assert additional facts which are mutually inconsistent and contradictory to his pleading or principle factual assertions. And in any case, on summary judgment, as noted above, Teague does not offer any factual assertions establishing that the confrontation inside the holding cell actually took place. "[A] party opposing summary judgment must do more than raise 'metaphysical doubt' as to the presence of a genuine issue of material fact." *See Miranda v. Wis. Power & Light Co.*, 91 F.3d 1011, 1016 (7th Cir. 1996) (quoting *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 586).

Teague next urges the Court to disregard the purported second confrontation as part of the *Heck* analysis. In effect, he asks the Court to cut off the set of facts at the first assault. He offers a list of cases in support. *See, e.g.*, *Hardwick v. City of Bolingbrook*, 522 F.3d 758 (7th Cir. 2008); *Gilbert v. Cook*, 512 F.3d 899, 900 (7th Cir. 2008); *Green v. Chvala,* 567 F. App'x 458, 460 (7th Cir. 2014). Teague's citations miss the mark. Here, the clear sequence of events that Teague asserts—the unprovoked blow from behind, the cut on his head, and his trip to the hospital—necessarily implies that the confrontation inside the cell between Officer Armstead and Teague did not occur. In none of the cited cases was the actual event that formed the basis for the underlying criminal conviction called into doubt by plaintiff's theory of civil liability.

Relatedly, Teague argues that whether Teague "struck first or not" is irrelevant to the *Heck* analysis, citing additional cases. *See* Pl.'s Mem. Opp'n 13–14 (citing Seventh Circuit cases). Teague, again, aims at the wrong target. These cases only serve to establish that an excessive force violation can coexist with an aggravated assault charge if the police used

13

excessive force to effectuate custody. But, as noted, in this case Teague's theory of events is inconsistent with his conviction for assault.

Lastly, Teague argues he can remain "agnostic" about the state court's findings, citing *Moore v. Mahone*, 652 F.3d 722, 723 (7th Cir. 2011), and *Gilbert*, 512 F.3d at 900. This is true as a matter of law. But "agnosticism" does not allow Teague to evade *Heck*. The "agnosticism" in *Gilbert* involved a plaintiff not confessing in open court to having struck the first blow in a scenario involving coexisting excessive force and state criminal claims stemming from one confrontation. *See Moore*, 652 F.3d at 723 (quoting *Gilbert*, 512 F.3d at 902). As *Moore* explains, the Court cannot ignore the implications of Teague's narrative before and after the unprovoked assault: Teague's asserted sequence of events "denies that [Teague] was violent . . . . The denial not only is inconsistent with the [trial court's] finding but serves to strengthen [Teague's] claim of excessive force." *Id.* at 725. The factual basis for the relief Teague seeks "is, given *Heck*, implausible, for it is that the plaintiff was the victim of an utterly unprovoked assault, and while that conceivably is true, it is barred by *Heck*." *Id.*

Teague "can only proceed with a § 1983 excessive force claim 'to the extent that the facts underlying the excessive force claim are not inconsistent with the essential facts supporting the conviction.'" *Ocasio*, 19 F. Supp. 3d at 854 (quoting *Helman*, 742 F.3d at 762). Teague proceeds on a factual sequence that forecloses the possibility that the confrontation inside the holding cell took place. If successful, Teague would necessarily invalidate the essential facts underlying his criminal conviction. And, in any case, there is no evidence establishing a genuine dispute of material fact that two separate confrontations occurred in the lock-up area. Consequently, *Heck* bars Plaintiff's excessive force claim.

14

## 2. An Adverse Inference is Unwarranted

Teague argues that, summary judgment is not warranted, because he is entitled to an adverse inference due to the destruction of material evidence. In imposing sanctions, courts generally look to three factors: "(1) the existence of a breach of the duty to preserve or produce documents; (2) the level of culpability for the breach; and (3) the prejudice that results from the breach." *Weitzman v. Maywood, Melrose Park, Broadview Sch. Dist. 89*, No. 13 C 1228, 2014 WL 4269074, at *2 (N.D. Ill. Aug. 29, 2014). "Fault can suffice for less harsh sanctions, but bad faith is required for a severe sanction such as dismissal or an adverse inference." *Id.* (citing *Norman–Nunnery v. Madison Area Tech. Coll.*, 625 F.3d 422, 428 (7th Cir. 2010)). Teague fails to meet the first two factors.

First, Teague offers no persuasive evidence that Defendants had a duty to preserve the videotape. As Defendants point out, Teague filed his civil rights lawsuit over a year later based on an alleged incident that occurred outside the holding cell. Though felony charges were approved the morning of the incident, they were felony charges based on an incident inside the lock-up holding cell, where there were no video cameras. And, despite Detective Ryan's attempts to interview Teague in the hospital, Teague refused to provide any information, including details of the incident inside the cell. *See* Defs.' Am. LR 56.1(a)(3) ¶ 21. Defendants thus had no knowledge of Teague's intention to file a lawsuit, and the tape was recycled automatically in accordance with an automatic 30-day recycle policy.

In an effort to establish that Defendants had a duty to pressure the videotape, Teague invokes *Brady v. State of Maryland*, 373 U.S. 83 (1963). Under *Brady*, the authorities had an obligation to preserve and produce exculpatory evidence to Teague. *See Mosley v. City of Chic.*, 614 F.3d 391, 397 (7th Cir. 2010). But because Teague's criminal trial concerned events

occurring inside the lock-up holding cell, where, as Defendant's point out, there were no video cameras, a videotape of events occurring outside the cell would not fall within *Brady*. Teague provides no evidence establishing that the ersatz videotape would have been exculpatory.[5]

That said, even if Defendants had a duty to preserve the hypothetical video tape, Teague has not offered any evidence of "bad faith." In order to be entitled to the adverse inference, Teague must establish that Defendants "intentionally destroyed the documents in bad faith." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 644 (7th Cir. 2008). "Thus, [t]he crucial element is not that evidence was destroyed but rather the reason for the destruction." *Id.* (quotation omitted). "A document is destroyed in bad faith if it is destroyed for the purpose of hiding adverse information." *Id.* (quotation omitted). Teague has not advanced any evidence establishing the requisite level of culpability. In the Seventh District Station, video tapes were recycled automatically. There is no evidence that Defendants failed to halt the recycling in an effort to hide adverse information; again, at that time, Defendants had no knowledge that a second incident allegedly occurred before the confrontation in the cell. Teague "has offered no evidence, other than his own speculation, that [the tapes] were destroyed to hide discriminatory information." *Id.* at 645 (quoting *Rummery v. Illinois Bell Telephone Co.*, 250 F.3d 553, 558 (7th Cir. 2001)). As such, Teague's request for an adverse inference is denied.

### B. The Claims Against the City Must Be Dismissed

Teague's First Amended Complaint appears to allege that Defendant City of Chicago failed to provide adequate training and supervision regarding the use of force. Defendants point out that there is no *respondeat superior* liability under Section 1983. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). To state a claim under *Monell*, Teague must bring forth evidence

---

[5] The Defendants had no duty to investigate the videotape if it was not exculpatory. *See Whitlock v. Brueggemann*, 682 F.3d 567, 588 (7th Cir. 2012) ("There is no affirmative duty on police to investigate.").

16

that a policy, custom, or practice of the City of Chicago was the "direct cause" or "moving force" behind the excessive force violation. *See Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010). Teague neither identifies any evidence in his memorandum in opposition nor makes any argument concerning the City of Chicago and his apparent *Monell* claim. By not responding to this argument Teague has waived it. Courts "have long refused to consider arguments that were not presented to the district court in response to summary judgment motions." *See Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (quoting *Arendt v. Vetta Sports, Inc.*, 99 F.3d 231, 237 (7th Cir. 1996)). Summary judgment is granted as to any *Monell* claim.

> **C.** **The Court Declines To Exercise Jurisdiction Over the Negligent Spoliation of Evidence Claim**

Where no federal claims remain, a district court typically will relinquish supplemental jurisdiction as to the remaining state law claims. *See Miller Aviation v. Milwaukee Cnty. Bd. of Supervisors,* 273 F.3d 722, 732 (7th Cir. 2001). "[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.,* 193 F.3d 496, 501 (7th Cir. 1999). Having dismissed all the federal claims, the Court declines to exercise supplemental jurisdiction over Teague's claim for spoliation of evidence filed pursuant to state law. *See* 28 U.S.C. § 1367(c)(3).

## IV. Conclusion

For the reasons provided herein, the Court grants Defendants' motion for summary judgment [141].  Civil case terminated.

**SO ORDERED**                   **ENTER:  3/10/15**

                                                **JOHN Z. LEE**
                                                **United States District Judge**